

# SUPREME COURT OF MISSOURI
## en banc

ALVIN BROCKINGTON,                )
Individually and On Behalf of      )
All Similarly-Situated,            )
                                   )
      Appellant,                  )
                                   )
v.                                 )    No.  SC99512
                                   )
NEW HORIZONS ENTERPRISES, LLC,  )
                                   )
      Respondent.                 )

*Opinion issued November 22, 2022*

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
**The Honorable Sandra C. Midkiff, Circuit Judge**

Alvin Brockington, individually and on behalf of a class of all similarly situated employees, appeals the circuit court's entry of summary judgment for New Horizons Enterprises, LLC.  Brockington's class action claims New Horizons violated the Missouri Prevailing Wage Act by failing to pay its employees the prevailing wage for work performed on properties in Kansas City, Missouri.  Because a genuine dispute exists regarding whether Brockington and other similarly situated New Horizons employees were employed "by or on behalf of any public body engaged in the construction of public works" within the meaning of the prevailing wage act, this Court reverses and remands to the circuit court for additional proceedings consistent with this Court's opinion.

# Factual Background[1]

The Planned Industrial Expansion Authority of Kansas City, Missouri ("PIEA") is a public body created pursuant to an ordinance passed in 1968 by the city council of Kansas City, Missouri. PIEA's stated purpose is to promote redevelopment of designated blighted areas in Kansas City. In 2005, PIEA prepared a development plan for an area of midtown Kansas City. The city council approved the plan, declared the locale included in the plan to be a blighted area, and authorized the preparation of an amended and restated blight study and development plan. Once completed, the city council approved the amended study and plan in February 2011. As early as 2006, city officials began ongoing development discussions with The Silliman Group, an affiliate of Antheus Capital, and provided incentives for Silliman to acquire properties in the area within the amended plan. During this time, PIEA worked directly with Silliman to conceive the Commonwealth Project. The project's objective was the redevelopment of a portion of the area within the amended plan.

PIEA solicited proposals from developers to complete the project. Commonwealth-KC Corp., Inc., also an affiliate of Antheus Capital, submitted a proposal. On February 28, 2011, PIEA accepted Commonwealth-KC's proposal, and the parties entered into a Redevelopment Agreement on the same date. The agreement described the project as a "proposed multi-family housing development with both affordable and market rate housing

---

[1] This Court reviews the record in the light most favorable to the party against whom summary judgment was entered. *Green v. Fotoohighiam*, 606 S.W.3d 113, 116 (Mo. banc 2020) (internal quotation omitted). Accordingly, the facts are set forth in the light most favorable to Brockington.

components and approximately six hundred units[.]" The agreement provided that PIEA would contribute up to $6,500,000 of city funding to Commonwealth-KC, in four equal installments over a four-year period ("KC grant"). The funds were to be applied exclusively toward "blight remediation costs of the Project, which [were] anticipated to include … masonry, window, HVAC, electrical, and plumbing costs[.]" To receive the KC grant, the agreement required Commonwealth-KC to comply with all requirements of the city's minority and women's business enterprise program, construction workforce program, and affirmative action program. Commonwealth-KC was also required to "submit reports to the City regarding progress, as well as payment of prevailing wage, independent contractors, minority/women/disadvantaged businesses utilization, payment of taxes, and other matters as set forth in [the] Agreement[.]"

The project was also to be financed by way of tax-exempt bonds in the amount of $38 million, state tax credits of $4.268 million, federal tax credits of $4.554 million, and Commonwealth-KC's equity of nearly $5.974 million. In addition, Commonwealth-KC was to receive a property tax abatement on the properties for 18 years, estimated to be worth more than $1.97 million. In a letter to the Kansas City mayor, PIEA touted the project as planning to provide 150 temporary construction jobs paying prevailing wages. PIEA also claimed in the letter that Commonwealth-KC would maintain 20 percent of the units as affordable units for tenants at or below 50 percent of the area median income.

The parties entered into a Development Contract in December 2011. Commonwealth Holdings I, LLC, another affiliate of Antheus Capital, was also party to the contract and was referred to as "Owner" of the designated real estate in the project.

3

The contract required Commonwealth-KC to "ameliorate the blighted condition of the Project Area through the redevelopment of the Project Area … substantially in accordance with the Proposal and the Plan." The contract further required Commonwealth-KC to "use reasonable efforts" to complete the project no later than December 31, 2014. It reiterated Commonwealth-KC's obligation to comply with the city's minority and women's business enterprise program, construction workforce program, and affirmative action program. The contract provided that, in accordance with either State prevailing wage act or federal law, "[Commonwealth-KC] will pay or caused to be paid a prevailing wage to all crafts employed for construction work as part of the Project" including that such wages be paid by both the general contractor and all subcontractors. PIEA was to engage Strategic Workplace Solutions to monitor compliance with "among other things, the Prevailing Wage Laws[.]"

For Commonwealth-KC to acquire the property tax abatement as contemplated in the agreement, the contract required Commonwealth-KC convey title to the project upon its substantial completion to the Planned Industrial Expansion Authority of Kansas City, Missouri Redevelopment Corporation ("PIEA Redevelopment"). In the contract, PIEA represented itself as the sole shareholder of PIEA Redevelopment. After PIEA Redevelopment received title to a redeveloped property, the contract provided that PIEA would deliver a tax exemption certificate for that property to Commonwealth-KC and "cause" PIEA Redevelopment to immediately re-convey the property to Commonwealth-KC or any of its affiliated entities. Finally, the contract provided that PIEA would exercise

4

its power of eminent domain to the extent necessary to clear any title discrepancies that might arise within the project area.

At the time that PIEA entered into the agreement and the contract, neither PIEA nor the city owned the properties comprising the project. However, Commonwealth Holdings conveyed title for at least 10 redeveloped properties to PIEA Redevelopment on various dates in 2012 and 2013.

Construction took place during 2011 through 2013. Throughout construction, Peter Cassel, Silliman's director of community development, regularly talked with PIEA's executive director about the progress being made on the project. Cassel also periodically attended PIEA board meetings to speak about the project's progress.

Commonwealth-KC selected Haren Laughlin Construction as the project's general contractor. But it was Silliman that hired New Horizons to perform asbestos abatement on the project. The work orders from Silliman to New Horizons specifically excluded payment of prevailing wages. New Horizons believed its work "completely disconnected" from the project because it did not contract with PIEA, Commonwealth-KC, or Haren Laughlin Construction, and the KC grant was to cover only "masonry, window, HVAC, electrical, and plumbing costs."

Brockington, along with 44 other New Horizons employees, performed construction work on the project from 2011 through 2012, including asbestos abatement and window work. New Horizons did not pay Brockington or the other employees prevailing wages.[2]

---

[2] The prevailing wage at the time ranged from $38.90 to $39.70 per hour. New Horizons paid most employees no more than $17.50 per hour.

The workers complained. In July 2013, Colleen White, head of Strategic Workplace Solutions, met with PIEA's Executive Director. Three weeks later, the executive director sent White a letter on behalf of PIEA informing her that only subcontractors hired by Haren Laughlin Construction were entitled to prevailing wages.

**Procedural History**

In November 2013, Laborers' International Union of North America, Local 264, individually and on behalf of a class of all similarly situated, filed a petition in the Jackson County circuit court alleging New Horizons violated the State's prevailing wage act and minimum wage law. In January 2017, Alvin Brockington was joined as a party and substituted for the union as the class representative. Brockington's "Amended Class Action Petition" included the same allegations as the original petition. Both Brockington and New Horizons filed motions seeking summary judgment.

The circuit court overruled Brockington's motion, sustained New Horizons' motion as to all Brockington's claims and entered summary judgment for New Horizons accordingly. The court of appeals affirmed. Brockington filed an application for transfer with this Court, which the Court granted pursuant to article V, section 10 of the Missouri Constitution.

**Standard of Review**

This Court outlined the standard of review for summary judgment in *Green*:

> The trial court makes its decision to grant summary judgment based on the pleadings, record submitted, and the law; therefore, this Court need not defer to the trial court's determination and reviews the grant of summary judgment *de novo*. In reviewing the decision to grant summary judgment, this Court applies the same criteria as the trial court in determining whether summary

judgment was proper. Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law. The facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion. Only genuine disputes as to material facts preclude summary judgment. A material fact in the context of summary judgment is one from which the right to judgment flows.

….

The record below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to the benefit of all reasonable inferences from the record. However, facts contained in affidavits or otherwise in support of the party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion.

606 S.W.3d at 115-16 (alteration in original) (quoting *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 452-43 (Mo. banc 2011)).

"[A] 'genuine issue' exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts …. [T]he rule that the non-movant is 'given the benefit of all reasonable inferences' means that if the movant requires an inference to establish his right to judgment as a matter of law, and the evidence reasonably supports any inference other than (or in addition to) the movant's inference, a genuine dispute exists and the movant's prima facie showing fails."

*ITT Commercial Finance Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. banc 1993).

### The Prevailing Wage Act

Under the circumstances and facts of this case, Brockington is entitled to the benefit of the prevailing wage act if two distinct elements are met. First, Brockington must have been employed "by or on behalf of any public body engaged in the construction." Section

290.230.1(1).[3]  Second, the public body must have been engaged in the construction of "public works." *Id.*  New Horizons does not contest the Project involved construction of "public works."  Neither does New Horizons contest that both the city and PIEA are public bodies.  Brockington does not contend he was employed "by" the city or PIEA.  The sole contested issue in this appeal is whether or not Brockington was employed "on behalf of any public body (the city or PIEA) engaged in the construction."

This Court addressed whether workers were employed "on behalf of any public body engaged in the construction" in *Division of Labor Standards, Department of Labor & Industrial Relations, State of Missouri v. Friends of the Zoo of Springfield, Missouri, Inc.*, 38 S.W.3d 421 (Mo. banc 2001) ([hereinafter *Friends of the Zoo*]).  In that case, Friends of the Zoo, a charitable organization, planned to fund the construction of a building at the zoo it would thereafter donate to the city of Springfield.  *Id.* at 422.  The Missouri Division of Labor Standards notified the city that the charity's request for construction bids violated the prevailing wage act. *Id.*  Because the project was to be constructed by Friends of the Zoo, the city responded that payment of prevailing wages was not required for the construction project.  *Id.*  The division sued.  *Id.*  The circuit court entered summary judgment for the city and Friends of the Zoo, but this Court reversed.  *Id.* at 424.  In so doing, this Court found that facts in the summary judgment record suggested the workers were employed "on behalf of" the city.  *Id.*  In particular, this Court noted that the zoo superintendent, a city employee, was also the executive director and registered agent of the

---

[3] All references are to RSMo Supp. 2021. The pertinent text of the statute remains the same as it was during the relevant time periods.

Friends of the Zoo, and this same city employee managed and controlled the charitable organization. *Id.* This Court remanded the case for the parties to conduct further discovery to determine if construction was being done "on behalf of" the city through its employee's involvement in the project. *Id.*

Similarly, the court of appeals reversed the circuit court's entry of judgment for the city of Camdenton in *State ex. inf. Webster ex rel. Missouri Department of Labor & Industrial Relations, Division of Labor Standards v. City of Camdenton*, 779 S.W.2d 312 (Mo. App. 1989). The city had argued the prevailing wage act did not apply to the construction of a building to be used as a firehouse and police station because the city did not own the constructed building. *Id.* at 315-16. The court of appeals found this to be a façade created to avoid paying prevailing wages. *Id.* at 316. It was apparent to the court of appeals that the building was constructed "on behalf of" the city. The city planned the building, solicited bids to carry out its plan, financed construction, was involved in various aspects of the project from start to finish, and rented the building for its own use upon completion. *Id.* at 313, 316-17. Accordingly, the act applied. *Id.* at 318.

**Analysis**

In this case, the summary judgment record includes evidence that creates a genuine dispute as to whether or not Brockington was employed "on behalf of any public body engaged in the construction."

The city and PIEA spent years preparing for redevelopment of the area. To that end, PIEA worked and planned with Silliman to conceive and pursue the development of the project. The project's stated purpose was to accomplish PIEA's mission of redeveloping

9

designated blighted areas of the city. The project also served to provide the public the benefit of affordable housing and to advance several public programs, including the city's minority and women's business enterprise program, construction workforce program, and affirmative action program. PIEA promised to exercise its power of eminent domain to the extent necessary to clear any title discrepancies that might arise within the project area. Commonwealth-KC partially funded the project, but PIEA provided the KC grant and tax exemption certificates. The KC grant was to be used for "blight remediation costs of the Project, which [were] anticipated to include … masonry, window, HVAC, electrical, and plumbing costs[.]" Brockington and other New Horizons employees performed construction work on the project, including window work. All these facts suggest Brockington was employed on behalf of a public body engaged in the construction.

PIEA did not directly supervise construction, but throughout construction, PIEA regularly communicated with Silliman regarding the project's progress. PIEA also signed a redevelopment agreement and development contract that indicated its ongoing involvement in the construction done to implement the project. The agreement provided PIEA would distribute the KC grant in four equal installments over a four-year period, and required Commonwealth-KC to submit progress reports to PIEA. In the contract, PIEA set forth a mandatory completion date, and required that Commonwealth-KC implement the project "substantially in accordance with the Proposal and the Plan." These facts suggest PIEA was involved in construction by retaining authority over its timeline, progress, and funding. In turn, this further indicates Brockington was employed on behalf of a public body engaged in the construction.

10

Commonwealth Holdings deeded temporary title of the redeveloped real estate to PIEA Redevelopment after the project's substantial completion. PIEA is the sole shareholder of PIEA Redevelopment, and the two entities share common leadership. In the contract, PIEA claimed the authority to "cause" PIEA Redevelopment to convey property within the project. These facts indicate PIEA controls PIEA Redevelopment. While PIEA Redevelopment may have reconveyed title to Commonwealth-KC or one of its affiliated entities pursuant to the contract, PIEA Redevelopment still retained title of the real estate redeveloped in the project area for at least some amount of time during the implementation of the project. This fact also suggests Brockington was employed "on behalf of any public body engaged in the construction."

New Horizons is correct to suggest some of the facts set out above considered in isolation are insufficient to trigger application of the prevailing wage act. *See State ex rel. Ashcroft v. City of Sedalia*, 629 S.W.2d 578, 582-83 (Mo. App. 1981) (holding "public benefit" alone is insufficient to warrant the application of the prevailing wage act); *Friends of the Zoo*, 38 S.W.3d at 422-23 (holding the "real and ultimate beneficiary" determination alone is insufficient to apply the prevailing wage act). But these separate facts must be considered together with all the other relevant facts developed in the summary judgment record. In *Friends of the Zoo*, this Court found neither party met its burden for summary judgment because the facts in the record suggested, but did not establish, the city of Springfield was so engaged in the zoo project that the construction workers were employed on behalf of the city. 38 S.W.3d at 424. The same is true here. The summary judgment record contains evidence that, taken together, creates a reasonable inference Brockington

11

was employed "on behalf of any public body engaged in the construction." Because the circuit court entered summary judgment for New Horizons, Brockington is entitled to the benefit of this reasonable inference. *Green*, 606 S.W.3d at 116 ("[T]he party against whom summary judgment was entered … is entitled to the benefit of all reasonable inferences from the record.").

While the facts contained in the summary judgment record create a reasonable inference that Brockington was employed "on behalf of any public body engaged in the construction," this record does not preclude a fact finder from reaching the opposite conclusion. Rather, the evidence developed in the record produced contrary inferences as to whether Brockington was employed on behalf of a public body engaged in the construction. A reasonable inference can be drawn that Brockington was employed on behalf of a public body engaged in the construction, but a reasonable inference can also be drawn that he was not.[4] Because the summary judgment record supports two plausible but contrary inferences as to whether Brockington was employed on behalf of any public body

---

[4] Commonwealth-KC partially funded the project, and the contract envisions Commonwealth-KC as the project's ultimate owner, not PIEA or the city. Neither PIEA nor the city directly supervised construction nor mandated its specifications. Moreover, New Horizons primarily performed asbestos abatement and trash removal, work not specifically covered as blight remediation in the agreement, and there is no evidence New Horizons was paid for its work with public funds. New Horizons was hired by Silliman purportedly outside of PIEA's agreement and contract with Commonwealth-KC, and PIEA did not object to New Horizons' employees receiving wages below the prevailing wage. Instead, the PIEA executive director advised that only subcontractors hired by Haren Laughlin Construction, the general contractor, were entitled to prevailing wages, suggesting PIEA believed New Horizons' work was performed at Silliman's request to advance Silliman's interests in the project rather than the city's or PIEA's interest. All this evidence supports a reasonable inference that Brockington was not employed on behalf of a public body engaged in the construction of the project.

12

engaged in the construction, a genuine dispute of material fact exists. *ITT Commercial Finance*, 854 S.W.2d at 382 (holding a "genuine issue" exists where the record contains competent evidence supporting "two plausible, but contradictory, accounts" of the facts). Accordingly, New Horizons is not entitled to summary judgment. *Id.*; *Green*, 606 S.W.3d at 115 (holding "genuine disputes as to material facts preclude summary judgment"). Ultimately, the fact finder must determine if Brockington was employed on behalf of any public body engaged in the construction of the Project.

## Conclusion

Because the circuit court erred in granting summary judgment to New Horizons, this Court reverses the judgment and remands the case for further proceedings consistent with this Court's opinion.[5]

_____
W. Brent Powell, Judge

All concur.

_____

[5] Brockington also filed a motion for attorney fees with this Court pursuant to the prevailing wage act. This Court, however, need not determine if Brockington is entitled to attorney fees under the act. Brockington acknowledges in his motion that such fees are not warranted until all litigation is concluded and unless judgment is entered in his favor. Because this Court remands this matter for further proceedings consistent with this Court's opinion, the circuit court may consider the propriety of Brockington's request upon its resolution of his claim. Accordingly, Brockington's motion is overruled.

13